UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| STEVEN KOCH,<br><br>Plaintiff,<br><br>vs.<br><br>KEN TRACY, individually and in his official capacity; and CITY OF MITCHELL,<br><br>Defendants. | 4:15-CV-04102-KES<br><br><br>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

Defendants, Ken Tracy and the city of Mitchell, move jointly for summary judgment. Plaintiff, Steven Koch, resists the motion. For the following reasons, the court grants the motion for summary judgment.

**BACKGROUND**

The facts, viewed in the light most favorable to Koch, the non-moving party, are as follows:

The city of Mitchell is a municipality in Davison County, South Dakota. Koch is a resident of Mitchell. Tracy is a resident of Mitchell, and he served as the mayor of Mitchell during the time relevant here.

Mitchell is home to what is commonly advertised as "The World's Only Corn Palace." The Corn Palace is a venue that hosts a variety of concerts, sporting events, and other exhibits. It is also a popular tourist destination. Administration of the Corn Palace is overseen by the Corn Palace director.

The Corn Palace director is an appointed position within Mitchell's government. It is also a highly visible position within the community. In 2014, Mitchell's then-current Corn Palace director resigned after a state audit revealed that he mishandled the Corn Palace's finances. His resignation and the circumstances surrounding it generated negative publicity toward Mitchell. Koch applied for the position in June 2014 after Mitchell began advertising to fill the vacancy. He filled out Mitchell's standard job application form. Koch was interviewed on October 3, 2014.

The interview went well for Koch, and he received a phone call from Tracy on October 9. Tracy asked if Koch was still interested in the Corn Palace director position. Koch stated that he was. Koch and Tracy arranged a time to meet in person to discuss details about the position. They met a week later on October 15. Koch and Tracy discussed various aspects of the job, such as the salary, benefits, a potential start date, and whether Koch got along with other Mitchell employees. Regarding a start date, Koch informed Tracy that the earliest he could start was on October 31 because Koch needed to give his current employer two weeks' notice. Koch and Tracy did not establish a firm start date at the meeting, but Tracy wanted to fill the position as soon as possible. Tracy verbally offered the position to Koch, and Koch accepted it. According to Koch's recollection, Tracy also informed him that "the City council vote would be a formality" with respect to Koch's approval for the position. Docket 21-1 at 20.

Koch turned in his two weeks' notice the following day. Koch testified that at the time he turned in his two weeks' notice that he understood that his employment as Corn Palace director was conditioned on a background check, a drug screening, and a physical examination. Docket 21-1 at 24. He submitted the applicable paperwork for those procedures. Koch then spoke with Mitchell personnel on October 17 and confirmed that his first day would be October 31. *Id.*

Koch spoke with Tracy again on October 20. Tracy informed Koch that some issues had arisen related to Koch's background check. Tracy asked if he could meet with Koch. Koch and Tracy arranged a meeting for later that week in Tracy's office. Tracy said that he was concerned about a 2002 misdemeanor conviction for petty theft that was on Koch's record. Tracy asked if Koch could explain what happened. Koch explained that the offense arose during his employment with his father's company called Upper Midwest Ag Products. The business was having money problems, and it could not secure a loan. Koch said that he agreed to co-sign a loan for his father, but the business ended up in bankruptcy. Koch explained that he was caught up in a criminal investigation because of the bankruptcy and due to his signature on the loan. Although Koch was originally charged with four felonies, he pleaded guilty to one count of misdemeanor petty theft. Koch and his father were ordered to pay restitution to four victims. In response, Tracy thanked Koch for his candor and said that he would still recommend Koch for the Corn Palace director position.

3

Tracy then gave Koch a tour of the Mitchell offices and introduced him as the next Corn Palace director to some of the Mitchell personnel. Docket 21-1 at 33.

Koch received another phone call from Mitchell personnel on October 29. He was informed that a reporter from the Mitchell Daily Republic–the local newspaper–wanted to interview him about the Corn Palace director position. Koch spoke briefly with the reporter. Tracy was also interviewed. An article appeared in the Daily Republic the following morning discussing the interviews and the Corn Palace director position.

On October 31, Koch reported for his first day of work. Koch was informed approximately twenty minutes after he arrived that Tracy would like to meet with him. Tracy stated that he recently became aware of additional facts surrounding Koch's misdemeanor conviction. For example, Tracy learned from others that Koch and his father used down payments that they had received from customers to pay outstanding bills. Tracy also asked Koch if there were alleged to be fourteen victims rather than four. Koch disputed that number. He believed that there were only four victims due to the number of charges originally brought against him. Tracy told Koch that he needed to trust his personnel and that he had lost confidence in Koch. Koch asked for an opportunity to prove himself through a probationary or trial period. Tracy refused and told Koch that "he wasn't going to recommend [him]" for the Corn Palace director position. Docket 21-1 at 36. Tracy also told Koch that it would be in his own best interest to withdraw his name from consideration for the position so that Koch could control the public's perception of what occurred.

4

Mitchell issued a press release later that day. The press release states in its entirety that "Mayor Ken Tracy has announced that Steve Koch has withdrawn his name for consideration as the Corn Palace Director. The search for a new Corn Palace director will begin immediately." Docket 21-1 at 89. An email was sent from Tracy's office to the Mitchell city council also announcing that Koch had withdrawn his name. Tracy stated during a radio interview that same day that Koch had withdrawn his name from consideration for the position. Tracy said that he was unsure why Koch made his decision. The Daily Republic and several other South Dakota news outlets reported on Koch's purported withdrawal.

Koch called Tracy on November 1. Koch asked if he could appear at the next city council meeting. Tracy declined. Koch called Jeff Smith, a council member, the next day. Koch asked Smith about appearing on the council's agenda. Smith responded that Koch's request could only be facilitated by Tracy and that Tracy had not placed Koch on the agenda.

Koch filed suit in this court on May 29, 2015. Docket 1. He alleged five claims for relief: (1) a § 1983 claim against Mitchell; (2) a breach of contract claim against Mitchell and Tracy; (3) an intentional interference with contractual relations claim against Tracy in his individual capacity; (4) a defamation claim against Mitchell and Tracy; and (5) an intentional infliction of emotional distress claim against Tracy. Tracy and Mitchell move for summary judgment on all of Koch's claims.

**LEGAL STANDARD**

Summary judgment on all or part of a claim is appropriate when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also In re Craig*, 144 F.3d 593, 595 (8th Cir. 1998). The moving party can meet its burden by presenting evidence that there is no dispute of material fact or that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the moving party has met this burden, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). "Further, 'the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment. . . . Instead, the dispute must be outcome determinative under prevailing law.'" *Id.* (quoting *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992)). The facts, and inferences drawn from those facts, are "viewed in the light most favorable to the party opposing the motion" for summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## DISCUSSION

### I.    Background

Mitchell is administered as an aldermanic form of government. Mitchell, S.D., Code § 1-5-1.[1] Its governing body consists of an elected mayor and a common city council. *Id.* A Mitchell ordinance designates several government offices as "Appointive Officers And Positions." Mitchell, S.D., Code § 1-6-1(A). The "director of the Corn Palace" is among the appointed positions listed. *See id.* South Dakota law provides that

> Such officers as needed and provided for by ordinance shall be appointed. Each appointive officer of a municipality governed by a mayor and common council shall be appointed by the mayor with the approval of the council . . . Such officers shall be appointed annually or at intervals determined by the governing body.

SDCL 9-14-3; *see also* Mitchell, S.D., Code § 1-6-1(B)(2) ("Each appointive officer shall be appointed by the mayor with the approval of the city council[.]").

A Mitchell ordinance also provides that "[e]ach appointive officer shall be appointed by the mayor with the approval of the city council for a term of office of one year[,]" but "[a]ny appointive officer may be removed from office and employment with the city as provided by the laws of the state." Mitchell, S.D., Code § 1-6-1(B)(2). Mitchell's employee policy manual likewise explains that "the City shall have the ability to terminate appointed employees pursuant to applicable state statutory law." Docket 21-1 at 85. South Dakota law prescribes the removal process as follows:

---

[1] Mitchell's ordinances are available online. *See Mitchell, South Dakota, City Code*, Sterling Codifiers, http://www.sterlingcodifiers.com/codebook/index.php?book_id=519.

> In an aldermanic-governed municipality, the mayor, except as
> otherwise provided, may remove from office any officer appointed
> by the mayor, if the mayor believes that the interests of the
> municipality demand such removal.

SDCL § 9-14-13. This statute vests the mayor with considerable discretion to

remove appointed officials. The South Dakota Supreme Court has held that

> The statute before us lacks both [a showing of cause for removal
> and an opportunity to be heard]. No opportunity to be heard is
> given, and it is enough if the mayor thinks there is sufficient
> cause. It may or may not exist, except in his imagination, but his
> conclusion is final.

*State ex rel. Dickson v. Williams*, 60 N.W. 410, 413 (S.D. 1894); *see also*

*Kierstead v. City of Rapid City*, 248 N.W.2d 363, 366 (S.D. 1976). More directly,

the Court has explained that appointed officials in aldermanic municipalities

are at will employees. *Finck v. City of Tea*, 443 N.W.2d 632, 634 (S.D. 1989)

(citing SDCL § 9-14-13 and noting that "[t]he Legislature has not seen fit to

depart from [at will] status" regarding appointive officials).[2]

## II.    Defamation

Koch argues that Tracy issued several defamatory communications in

print and by spoken word to the press and Mitchell city council.[3] Those

statements represented that Koch chose to withdraw his name from

---

[2] The job application that Koch filled out likewise contained an acknowledgement that "I understand that my employment is at will of both parties, for no definite period of time, and termination may be with or without cause." Docket 21-1 at 52.

[3] Koch alleges that both Tracy and Mitchell are liable for defamation. He does not provide a basis for Mitchell's liability independent of the statements made by Tracy. The court assumes for the purposes of this analysis that Tracy's statements are imputed to Mitchell.

consideration for the Corn Palace director position and that Tracy was unsure why Koch did so.[4] Tracy and Mitchell argue that the statements were either privileged or, if not privileged, that no defamatory statement was made.

## A.     Privilege

Defamation is either libel or slander. SDCL 20-11-2; *see also* SDCL 20-11-3 (defining libel) and SDCL 20-11-4 (defining slander). Libel and slander are each defined as "unprivileged" communications. *Pawlovich v. Linke*, 688 N.W.2d 218, 221 (S.D. 2004). "Therefore, a defamation action may not survive if the alleged defamatory communication was privileged." *Id.* (citing *Peterson v. City of Mitchell*, 499 N.W.2d 911, 915 (S.D. 1993)). South Dakota law defines several "communications which are considered 'privileged' and therefore outside the scope of the definitions of libel or slander." *Peterson*, 499 N.W.2d at 915. The statute provides:

A privileged communication is one made:

(1) In the proper discharge of an official duty;

(2) In any legislative or judicial proceeding, or in any other official proceeding authorized by law;

(3) In a communication, without malice, to a person interested therein, by one who is also interested, or by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent,

---

[4] These comments were made after Tracy's October 29 interview with the Mitchell Daily Republic where Tracy allegedly informed the newspaper that he would recommend Koch for the Corn Palace director position in spite of Koch's misdemeanor conviction. Tracy and Mitchell stress that the October 29 interview and subsequent newspaper article appeared before Tracy learned of the additional details regarding Koch's misdemeanor conviction. The timing of those events is immaterial to the court's resolution of this issue.

9

or who is requested by the person interested to give the information;

(4) By a fair and true report, without malice, of a judicial, legislative, or other public official proceeding or of anything said in the course thereof.

In the cases provided for in subdivisions (3) and (4) of this section, malice is not inferred from the communication or publication.

SDCL 20-11-5.

The statutory privileges are either "absolute" or "conditional." *Pawlovich*, 688 N.W.2d at 221 (citing *Flugge v. Wagner*, 532 N.W.2d 419, 421 (S.D. 1995)). An absolute privilege immunizes a defendant from liability regardless of whether his communication was false and regardless of whether it was made with malice. *Id.* (citing *Setliff v. Akins*, 616 N.W.2d 878, 891 (S.D. 2000)). The privileges defined in SDCL 20-11-5(1) and (2) are absolute. *Id.* A conditional privilege also immunizes a defendant from liability but only if the communication was made without malice. *Id.* (citing *Flugge*, 532 N.W.2d at 421). "Malice" in the defamation context means that the defendant "actually knew that the defamatory statements were false or acted with reckless disregard of the truth." *Nelson v. WEB Water Dev. Ass'n, Inc.*, 507 N.W.2d 691, 697 (S.D. 1993) (citing *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 286 (1964)). Because malice is not inferred from the communication alone, "the plaintiff has the burden of proving actual malice that destroys the [conditional] privilege." *Pawlovich*, 688 N.W.2d at 224 (quoting *Kieser v. Se. Props.*, 566 N.W.2d 833, 838 (S.D. 1997)). "[A] specific showing of malice is required for purposes of raising a genuine issue of material fact." *Id.* (quoting *Tibke v. McDougall*, 479

N.W.2d 898, 905 (S.D. 1992)) (alteration in original). The privileges defined in SDCL 20-11-5(3) and (4) are conditional. *Id.* at 221. "The existence of a privilege is a question of law." *Schwaiger v. Avera Queen of Peace Health Servs.*, 714 N.W.2d 874, 978 (S.D. 2006).

### 1.    Analysis

Koch ostensibly agrees that Tracy's statements are privileged. He "agrees that Mayor Tracy is entitled to qualified privilege under both the SDCL § 20-11-5(3) 'interested person' standard, as well as the public figure/public matter standard." Docket 27 at 3.[5] Koch "disagrees, however, that Tracy is entitled to absolute privilege under SDCL § 20-11-5(1)." *Id.* But communications are either privileged or they are not, and Tracy does not need the benefit of multiple privileges when any one of them would insulate him from liability. *See Pawlovich*, 688 N.W.2d at 221. The court assumes that Koch intended to make a more limited admission, namely, that the "interested person" privilege of SDCL 20-11-5(3) and the public figure doctrine apply but only if Tracy did not make the communications with malice.

The court begins its analysis, however, with whether Tracy's communications are entitled to absolute privilege. The South Dakota Supreme Court in *Hackworth v. Larson*, 165 N.W.2d 705, 707 (S.D. 1969) analyzed "a libel action predicated on a news release issued by the defendant, Alma H.

---

[5] Like a plaintiff who must overcome a conditional privilege, a plaintiff who is considered a public figure must also prove that a communication was made with malice to prevail on a defamation cause of action. *Nelson*, 507 N.W.2d at 696-97.

Larson, Secretary of State of South Dakota." The plaintiffs were former employees who worked in Larson's office. *Id.* "They questioned the manner in which defendant Larson conducted the office and were critical of the official conduct of an employee therein." *Id.* The plaintiffs then sent Larson a letter informing Larson that the plaintiffs would take their annual leaves and that their resignations would become effective after they returned. *Id.* Larson issued a press release, however, publically rejecting the plaintiffs' resignations and announcing that the plaintiffs had been fired for several reasons. *Id.* at 708. The plaintiffs sued Larson for libel. Larson moved for summary judgment and argued that she was entitled to an absolute privilege. *Id.* at 709.

The plaintiffs responded that Larson "does not enjoy an absolute privilege because she was not required by law or otherwise to issue statements to the press." *Id.* The Court disagreed. It held that "[i]t is now well-established that the issuance of press releases is an essential activity of public officials if 'within the outer perimeter' of their line of duty." *Id.* (citing cases). "The theory behind this view is that it is in the public interest that information be made available as to what takes place in public affairs." *Id.* The Court reasoned that

> Defendant Larson was a constitutional officer and the incident in question involved her duty of hiring and discharging the personnel of her office. Clearly, the release which she issued had a real relation to the general matters committed by law to her control and supervision. It has long been recognized that a defamatory statement issued by a public official in the proper discharge of his official duties is absolutely privileged.

*Id.* Larson enjoyed an absolute privilege "even if [the press release] contained false or inaccurate statements[.]" *Id.* Thus, she was entitled to summary judgment.

Similarly, the Court in *Ruple v. Weinaug*, 328 N.W.2d 857, 858 (S.D. 1983) analyzed a claim that the city manager of Vermillion "committed defamation, libel, and slander." The plaintiff was a former public employee who served as an appointed official. *Id.* Numerous conflicts developed between the plaintiff and other city personnel. *Id.* The city manager went to the mayor and informed him of the situation. *Id.* The mayor requested a written report concerning the plaintiff from the city manager, and the city manager provided one. *Id.* The report was distributed at a closed city council meeting. *Id.* The plaintiff sued the city manager for defamation, and the city manager moved for summary judgment on the issue of absolute privilege.

The Court discussed *Hackworth* and "[found] it on point." *Id.* at 860. The city manager had statutory supervisory authority over the plaintiff, and the city manager "certainly was an officer and public official[.]" *Id.* The Court held that "although [the city manager] is not a constitutional officer," the absolute privilege in SDCL 20-11-5(1) applied to him. *Id.* Thus, the city manager was entitled to an absolute privilege.

Here, as to the press release and the similar statements Tracy made to the media regarding Koch's alleged withdrawal from consideration for the Corn Palace director position, the court finds that Tracy's comments are entitled to an absolute privilege. Tracy is the chief executive officer of Mitchell. *See*

13

SDCL 9-8-1 ("The chief executive officer of a municipality under the aldermanic form shall be a mayor"). South Dakota Codified Law 9-8-3 states the mayor's powers and duties with generality. *Finck*, 443 N.W.2d at 634. "[A]lthough [the statute] do[es] not specifically mention hiring and firing of employees, it does state that the mayor 'shall perform such other duties as may be prescribed by the laws and ordinances[.]' " *Id.* (quoting SDCL 9-8-3). South Dakota Codified Law 9-14-13 vests the mayor with considerable discretion to remove appointive officials. *Id.* (citing SDCL 9-14-13). The Corn Palace director is an appointive official. Mitchell, S.D., Code § 1-6-1(A). The mayor's power concerning appointive officials "is one of the 'great' powers afforded municipalities" and "is necessary to the exigencies of administrating local government." *Patterson v. Linn*, 636 N.W.2d 467, 469 (S.D. 2001). Thus, the hiring and discharging of appointive officials is a necessary duty of Tracy's office as mayor. *See Hackworth*, 165 N.W.2d at 709.

The comments Tracy made also have "a real relation to the general matters committed by law to [his] control and supervision." *See id.* The Corn Palace is one of, if not the, most important facets of Mitchell. Likewise, the Corn Palace director is a highly visible position within Mitchell. And Mitchell endured recently a public scandal involving the previous Corn Palace director. Therefore, the individual who assumes the office of the Corn Palace director is a matter of public interest. *Id.* (explaining that "it is in the public interest that information be made available as to what takes place in public affairs"). Thus, Tracy's statements were " 'within the outer perimeter' of [his] line of duty." *Id.*

14

The fact that Tracy is not a "constitutional officer" as in *Hackworth* does not change the court's analysis. *See Ruple*, 328 N.W.2d at 860. Rather, it is sufficient that Tracy "is an officer and public official . . . who communicated in that capacity[.]" *Id.* Thus, Tracy's comments are entitled to an absolute privilege. *Hackworth*, 165 N.W.2d at 709.

A similar analysis applies to Tracy's email communication with the Mitchell city council. South Dakota Codified Law provides that "[t]he mayor shall preside at all meetings of the council" and "from time to time give the council information relative to the affairs of [Mitchell]." SDCL 9-8-3. The Mitchell city council votes to approve appointive officials. SDCL 9-14-3. Therefore, whether an appointive official would be coming up for a vote or not is information relative to the affairs of Mitchell. Consequently, Tracy's communication to the Mitchell city council that Koch withdrew his name from consideration is " 'within the outer perimeter' of [his] line of duty." *Hackworth*, 165 N.W.2d at 709. Thus, Tracy's email to the Mitchell city council is also entitled to an absolute privilege.

Koch's arguments to the contrary are not persuasive. He asserts that it is not within Tracy's duties as mayor to comment on the termination of an appointive official to the media and that Tracy could not properly discharge any official duty by making false statements. As to Koch's first argument, the court is satisfied that commenting to the press and Mitchell city council about who would or would not become the next Corn Palace director is within Tracy's authority as mayor. As to Koch's second argument, whether an absolute

15

privilege applies does not depend on the truth or falsity of the communication. *Pawlovich*, 688 N.W.2d at 221. Tracy's statements are, therefore, protected by an "absolute privilege even if [they] contained false or inaccurate statements[.]" *Hackworth*, 165 N.W.2d at 709. Thus, the defendants are entitled to summary judgment on this issue.

## III.   Section 1983 Claim

Koch asserts a claim against Mitchell pursuant to § 1983. Section 1983 provides a cause of action against any "person who, under the color of any statute, ordinance, regulation, custom, or usage, of any state" causes the deprivation of a right protected by federal law or the United States Constitution. 42 U.S.C. § 1983. "[M]unicipalities and other local government units" are considered "persons to whom § 1983 applies." *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690 (1978). "To recover under § 1983, a plaintiff must prove '(1) violation of a constitutional right, (2) committed by a state actor, (3) who acted with the requisite culpability and causation to violate the constitutional right.' " *McDonald v. City of Saint Paul*, 679 F.3d 698, 704 (8th Cir. 2012) (quoting *Shrum ex rel. Kelly v. Kluck*, 249 F.3d 773, 777 (8th Cir. 2001)).

The first issue is whether Koch suffered a deprivation of his federally protected rights. *Shrum*, 249 F.3d at 777 (quoting *Roach v. City of Fredericktown*, 882 F.2d 294, 297 (8th Cir. 1989)). Without an underlying constitutional wrong, there can be no municipal liability. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) (explaining the Court's first inquiry in

16

a § 1983 claim against a municipality is whether there is a causal link between a municipal policy or custom and the constitutional violation); *Monell*, 436 U.S. at 691 (explaining that § 1983 liability may only be imposed upon a municipality for underlying constitutional violations that are attributable to official municipal policy). Here, Koch alleges that Mitchell's policies and practices caused the deprivation of his due process and First Amendment rights.

### A.    Due Process

"The possession of a protected life, liberty or property interest is a condition precedent to the government's obligation to provide due process of law, and where no such interest exists, there can be no due process violation." *Dobrovolny v. Moore*, 126 F.3d 1111, 1113 (8th Cir. 1997). Koch argues that he was a Mitchell employee and,[6] as such, that he had a protected property and/or liberty interest in his continued employment.

The Eighth Circuit in *McDonald* analyzed a similar issue. There, an ordinance read in pertinent part that "the mayor shall appoint, with the advice and consent of the council, to the positions of city attorney and all heads of executive departments[.]" *McDonald*, 679 F.3d at 704-05 (quoting St. Paul Code

---

[6] The parties debate whether Koch was "an employee." The South Dakota Supreme Court has long recognized that "[t]here is a distinction between a public officer and an employee." *Sioux Falls Mun. Emp. Ass'n, Inc. v. City of Sioux Falls*, 233 N.W.2d 306, 304 (S.D. 1975). As explained, *supra*, the Corn Palace director position is a public official rather than an employee. The court, nonetheless, will use the phrase "Mitchell employee" here for the sake of clarity.

of Ordinances, § 3.01.3). The Eighth Circuit explained that that "[t]he ordinance governing the mayor's appointment power required mayoral appointment *and* city council approval as *pre-requisites* to assuming the position of director." *Id.* at 705 n.4 (emphasis added). The St. Paul ordinance is substantially the same as SDCL 9-14-3 and Mitchell's appointment ordinance here. Thus, two prerequisites are required for Koch to assume the position of Corn Palace director: (1) appointment by the mayor; and (2) approval from the Mitchell city council.[7]

It is undisputed that Tracy did not recommend or otherwise appoint Koch to the Corn Palace director position. Although Koch arrived for work on October 31, Tracy informed him roughly twenty minutes into the day and before Koch performed any official duty that Tracy would not be recommending Koch for the position.[8] It is also undisputed that the Mitchell city council did not vote to approve Koch for the position. Its vote of approval was still a pre-requisite even if Koch thought that the Mitchell city council's vote would be a formality. Consequently, Koch did not assume the position of the Corn Palace director. Thus, Koch does not have a protected liberty or property interest in a position that he did not hold. *McDonald,* 679 F.3d at 705.

---

[7] Appointed officials are also required to take an oath of office prior to the assumption of their duties. *See* SDCL 9-14-6; Mitchell, S.D., Code § 1-6-1(C).

[8] Koch acknowledged that prior to his meeting with Tracy he did not attend orientation, receive a Mitchell cellular phone, fill out a W-2 or I-9, fill out any paperwork related to employee benefits, execute any official duties as Corn Palace director, hire or fire any employees, plan any events, or attend any meetings with anyone except Tracy. Docket 21-1 at 34-35.

The court, nonetheless, assumes for purposes of this analysis only that Koch was the Corn Palace director and that Tracy removed him from office on October 31. As discussed in section I, *supra*, the Corn Palace director is an at-will position. Koch argues that he had a protected property interest in his continued employment as the Corn Palace director. But "it is well established that at-will employees do not have a property interest in their continued employment, and thus their termination cannot support a procedural due process claim." *Hess v. Ables*, 714 F.3d 1048, 1053 (8th Cir. 2013). Thus, Koch's property-based due process claim fails.[9]

Koch also argues that he had a protected liberty interest in his continued employment. "An at-will public employee generally does not have a protected liberty interest in continued employment which would obligate a government employer to provide a hearing in connection with the employee's discharge." *Hammer v. City of Osage Beach, MO*, 318 F.3d 832, 839 (8th Cir. 2003). But an at will public employee has a liberty interest in his good name and reputation. *See, e.g.*, *Bishop v. Wood*, 426 U.S. 341, 348 (1976); *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 573 (1972). That liberty interest is implicated when the government publicly stigmatizes an employee in conjunction with that employee's termination. *Hammer*, 318 F.3d at 839. To succeed on this theory, Koch must demonstrate:

---

[9] One city councilmember testified that he "believe[d]" that Koch was entitled to a grievance hearing, but he was unable to identify the basis for that belief. *See* Docket 29-3 at 9.

> (1) that the public employer's reasons for the discharge stigmatized the employee, seriously damaging his or her reputation or by foreclosing other employment opportunities; (2) that the employer made the reasons for the discharge public; and (3) that the employee denied the charges that led to the discharge.

*Id.* at 839-40 (citations omitted).

As to the stigmatization element, the Eighth Circuit has explained that the employer's public accusations must be "so damaging as to make it difficult or impossible for the employee to escape the stigma of those charges." *Shands v. City of Kennett*, 993 F.2d 1337, 1347 (8th Cir. 1993) (citation omitted). "The requisite stigma has generally been found in cases in which the employer has accused the employee of dishonesty, immorality, criminality, racism, or the like." *Id.* For example, the mayor in *Hammer*, 318 F.3d at 836, issued a press release accusing Hammer of "general improprieties and illegalities related to the City's health insurance, contract bids, and Hammer's termination of another City employee." Additionally, Hammer presented evidence that potential employers confronted him with the allegations and that he was refused employment because of the accusations. *Id.* at 840. The Eighth Circuit held that the mayor's statements were sufficiently stigmatizing. *Id.* By contrast, in *Kyles v. E. Neb. Human Servs. Agency*, 632 F.2d 57, 61 (8th Cir. 1980), an employer publically stated that Kyles was discharged due to "poor attitude, unsupportive actions toward his supervisors, disobeying agency directives, and poor relationships with others in the agency." The Eighth Circuit held that those statements were not sufficiently stigmatizing. *Id.* And in *Shands*, 993 F.2d at 1347, an employer told others that Shands was fired for "acts of

insubordination and misconduct." The Eighth Circuit held that "the general allegation of misconduct in this case does not by itself rise to the level of constitutional stigma." *Id.*

Here, Koch argues that Tracy admitted the reason he terminated Koch was because Tracy " 'lost faith in him.' " Docket 27 at 8. This purported statement is not accompanied by a citation to the record. Tracy testified in a November 13, 2015 deposition that he "had lost confidence in [Koch]" because Tracy felt that Koch was not forthright with him. Docket 29-12 at 16. But that statement does not satisfy the stigmatization requirement because it was made in the course of a judicial proceeding, and it was made long after Koch's discharge. *Bishop*, 426 U.S. at 348 ("And since the latter communication was made in the course of a judicial proceeding which did not commence until after petitioner had suffered the injury for which he seeks redress, it surely cannot provide retroactive support for his claim").

The other statements identified by Koch concern Tracy's assertion that Koch withdrew his name from consideration for the Corn Palace director position and that Tracy was unsure why Koch did so. The court assumes for purposes of this analysis that Tracy's statements were false and that Koch denied them. Koch argues that Tracy's statements imply that Koch was indecisive, disingenuous, or untrustworthy, even if Tracy did not attribute those characteristics to Koch directly. Koch also points to various newspaper articles that reported on his criminal background after Tracy issued the October 31 press release.

21

The plaintiff in *Shands* made a similar argument. There, a newspaper reporter wrote a series of critical articles following several interviews with the plaintiff's former employer. *Shands*, 993 F.2d at 1341. The Eighth Circuit explained that when analyzing a claim of "stigmatiz[ation] by innuendo," a court must focus on "what the city officials actually [said]" and not what is reported by others. *Id.* at 1348. Tracy's statements are not analogous to accusations that Koch is dishonest, immoral, a criminal, or a racist. Rather, Tracy's actual statements are less onerous than the direct accusations of insubordination or misconduct that the Eighth Circuit has identified as insufficiently stigmatizing. *See Kyles*, 632 F.2d at 61; *Shands*, 993 F.2d at 1347. Although the articles discuss Koch's criminal history, Koch has not identified any statements attributable to Tracy or Mitchell that accuse him falsely of criminal conduct or dishonesty.[10] And Koch has not presented any evidence that any employment opportunities were foreclosed in conjunction with statements attributable to the City.[11] *Cf. Hammer*, 318 F.3d at 840. Thus, Koch's liberty-based due process claim fails.

---

[10] The falsity requirement is significant because there is no dispute that Koch was convicted of petty theft. The purpose of the hearing contemplated by *Roth* is to give the discharged employee an opportunity to rebut the false charges made against him. *Codd v. Velger*, 429 U.S. 624, 627 (1977). But if the employer's statements are true then the hearing will not "serve any useful purpose." *Id.* Additionally, the newspaper articles explain that the paper obtained Koch's criminal record from the South Dakota Unified Judicial System. *See, e.g.*, Docket 21-1 at 96. And Koch himself acknowledged that his criminal history was public knowledge. *Id.* at 40.

[11] Koch testified that he called Brandon Bjerrum at Dakota Manufacturing to see if the company had an open position. Docket 21-1 at 40. Bjerrum did not return Koch's phone call. *Id.* at 41. There is no evidence that

### B.      Redress and Assembly

Koch argues that his First Amendment rights were violated when Tracy refused to place Koch on the Mitchell city council's agenda. More specifically, Koch argues that his rights to petition the government and to peaceably assemble were infringed by Tracy's refusal.

" 'The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances.' " *De Jonge v. Oregon*, 299 U.S. 353, 260 (1937) (quoting *United States v. Cruikshank*, 92 U.S. 542, 552 (1875)); *see also United Mine Workers of Am. Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967). A Mitchell ordinance provides that Mitchell city council meetings are to be held "in the city hall, unless another site shall be specified." Mitchell, S.D., Code § 1-5-4(A). South Dakota law provides that city council meetings shall be held "on the first Monday of each month" and "with open doors[.]" SDCL 9-8-8. Thus, Koch has the right to attend Mitchell city council meetings.

Here, and viewing the facts in the light most favorable to Koch, the record shows that Koch spoke to Tracy on November 1, the day after Tracy told Koch that he would not recommend Koch for the Corn Palace director position. Koch asked Tracy to place him on the Mitchell city council's agenda, and Tracy refused. Koch also spoke with councilmember Smith, who told Koch that

---

Bjerrum's failure to return Koch's phone call is related to any statement made by Mitchell.

appearing on the council's agenda was up to the mayor. Ultimately, Koch did not appear on the City council agenda.

Koch has not identified any rule of law–whether from an ordinance, policy handbook, statute, or caselaw–that required Tracy to arrange for Koch to appear at the Mitchell city council meeting. For example, Koch presents no evidence that he attempted to speak at the Mitchell city council meeting and was expelled due to the content of his views.[12] *See Jones v. Heyman*, 888 F.2d 1328, 1331-32 (11th Cir. 1989). As discussed in section I, *supra*, the Corn Palace director position was terminable at will and subject to removal without a hearing. Thus, Koch would not be entitled to a hearing before the Mitchell city council even if the court assumes that he was the Corn Palace director. And the Mitchell city council has a legitimate interest in regulating the schedule of its meetings. *City of Madison, Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n*, 429 U.S. 167, 176 n.8 (1976). "The guarantees of the First Amendment have never meant 'that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please.' " *Greer v. Spock*, 424 U.S. 828, 837 (1976) (quoting *Adderley v. Florida*, 385 U.S. 39, 48 (1966)). Koch has not presented any evidence of conduct giving rise to a First Amendment violation. Thus, his First Amendment claim fails.

---

[12] Several councilmembers testified that any Mitchell citizen can approach the council and be heard prior to the start of the meeting, regardless of whether the citizen is on the agenda, according to a process referred to as a "citizen's input." Docket 29-2 at 7; Docket 29-3 at 8; Docket 29-7 at 9. There is no evidence that Koch attempted to avail himself of this procedure.

Koch has not demonstrated that he suffered the deprivation of any federally protected right. Thus, Mitchell is entitled to summary judgment on Koch's § 1983 claim.

## IV.   Breach of Contract

Koch alleges that he had a contract for his employment with Mitchell. He argues further that Tracy and Mitchell breached that contract by summarily terminating his employment. In South Dakota, a breach of contract claim has three elements: (1) a binding contract; (2) a breach of the contract; and (3) resulting damages. *Guthmiller v. Deloitte & Touche, LLP*, 699 N.W.2d 493, 498 (S.D. 2005). It is undisputed that the parties never executed a written contract. Also, as explained in section II, *supra*, Koch was not appointed to the Corn Palace director position. Koch, nonetheless, argues that the parties entered an oral contract for his employment as the Corn Palace director.

For purposes of this claim, the court assumes that the parties had an enforceable, oral agreement for Koch's employment as the Corn Palace director. Koch acknowledges that his employment would be terminable at will. An at will employee can be discharged "at any time for any reason." *Petersen v. Sioux Valley Hosp. Ass'n*, 486 N.W.2d 516, 520 (S.D. 1992).[13] Thus, an employer who summarily terminates an at will employee will generally not face liability under

---

[13] Public policy, however, recognizes some impermissible reasons for terminating an at will employee, such as when an employee is fired (1) for his refusal to commit a crime; (2) for filing a worker's compensation claim; and (3) for whistleblowing. *Semple v. Fed. Exp. Corp.*, 566 F.3d 788, 792 (8th Cir. 2009) (citing *Dahl v. Combined Ins. Co.*, 621 N.W.2d 163, 166-67 (S.D. 2001)). None of these exceptions apply to Koch.

a breach of contract theory. *See Niesent v. Homestake Min. Co. of Cal.*, 505 N.W.2d 781, 782 (S.D. 1993).

An employer may, in certain circumstances, waive its statutory right to hire and fire employees at will. *Holland v. FEM Elec. Ass'n, Inc.*, 637 N.W.2d 717, 720 (S.D. 2001). A waiver occurs when an employer "affirmatively indicate[s] its intent [to do so] by adopting a personnel policy or manual explicitly providing that a for-cause termination procedure must be followed." *Id.* (citing cases). Another method of establishing a waiver occurs when "the policy or manual 'contains a detailed list of exclusive grounds for employee discipline or discharge and a mandatory and specific procedure which the employer agrees to follow prior to any employee's termination.' " *Id.* (quoting *Hollander v. Douglas Cty.*, 620 N.W.2d 181, 185 (S.D. 2000)). And a third method of establishing a waiver occurs when an employer makes a specific oral promise to an employee regarding future promotion to a certain position. *Breen v. Dakota Gear & Joint Co., Inc.*, 433 N.W.2d 221, 223 (S.D. 1988) (citing *Larson v. Kreiser's, Inc.*, 427 N.W.2d 833, 835 (S.D. 1988)). Koch does not allege that any of these exceptions to the at will doctrine apply. As discussed in section I, *supra*, a Mitchell ordinance provides that appointive officers serve a term of office for one year but those officers are, nonetheless, terminable at will by the mayor. Koch was asked several times whether anyone represented to him that his appointment was guaranteed for a one-year term, but he denied that such a representation was made to him. *See* Docket 21-1 at 17, 45. Thus, Koch could be terminated at any time. As a result, his removal was not a breach.

26

Koch also argues that Tracy and Mitchell breached the covenant of good faith and fair dealing that is implied in every contract. *See Garrett v. BankWest, Inc.*, 459 N.W.2d 833, 841 (S.D. 1990). "The application of this implied covenant allows an aggrieved party to sue for breach of contract when the other contracting party, by his lack of good faith, limited or completely prevented the aggrieved party from receiving the expected benefits of the bargain." *Id.* "But good faith is not a limitless duty or obligation. The implied obligation 'must arise from the language used or it must be indispensable to effectuate the intention of the parties.' " *Id.* (quoting *Sessions, Inc. v. Mortion*, 491 F.2d 854, 857 (9th Cir. 1974)). And a claim for a breach of the covenant of good faith fails when a contracting party merely avails itself of a right provided for in the contract. *Farm Credit Servs. of Am. v. Dougan*, 704 N.W.2d 24, 29 (S.D. 2005). Therefore, even assuming that an oral contract existed, the contract entitled Tracy to terminate Koch at will. *Breen*, 433 N.W.2d at 224. Thus, Tracy and Mitchell are entitled to summary judgment on Koch's breach of contract claim.

## V.   Tortious Interference

Koch argues that Tracy tortuously interfered with Koch's contract for employment as the Corn Palace director. Tracy is sued in his individual capacity. In South Dakota, the elements of a tortious interference claim are: (1) the existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an intentional and improper

27

act of interference on the part of the interferer;[14] (4) proof that the interference caused the harm sustained; and (5) damage to the party whose relationship or expectancy was disrupted. *Tibke*, 479 N.W.2d at 908. Tracy and Mitchell argue that summary judgment is appropriate because Koch cannot prove the essential elements of his claim.

The existence of a contract is not dispositive. *Hayes v. N. Hills Gen. Hosp.*, 590 N.W.2d 243, 248 (S.D. 1999) (" 'For this tort to occur, the business relationship, if in existence, need not be cemented by written or verbal contract and, whether or not it is in existence, it need not be intended that there be a contract.' ") (quoting 45 Am. Jur. 2d *Interference* § 50 (1969)). Thus, the court does not need to determine if a contract for employment existed between Koch and Mitchell. An identifiable third party, however, is indispensable. *Gruhlke v. Sioux Empire Fed. Credit Union*, 756 N.W.2d 399, 406 (S.D. 2008). "[T]o establish a 'valid business relationship or expectancy,' there [must] be a showing of a 'contract or business relationship' between the plaintiff and an identifiable third party." *Landstrom v. Shaver*, 561 N.W.2d 1, 16 (S.D. 1997) (quoting *Tibke*, 479 N.W.2d at 908). Thus, the South Dakota Supreme Court has analogized this cause of action to "a 'triangle' [involving] a plaintiff, an identifiable third party who wished to deal with the plaintiff, and the defendant who interfered with the plaintiff and the third party." *Id.*

---

[14] The South Dakota Supreme Court previously described the third element as involving "unjustified" interference, which was recently modified to require a showing of "improper" interference. *See Gruhlke v. Sioux Empire Fed. Credit Union, Inc.*, 756 N.W.2d 399, 408 (S.D. 2008).

As discussed in section II, *supra*, Tracy is the chief executive officer of Mitchell. The issue here is, therefore, whether there is an identifiable third-party for purposes of Koch's tortious interference claim. *Gruhlke*, 756 N.W.2d at 406 ("With interference suits against corporate officers, determination of [this] element precedes any further analysis"). "One contracting party does not have a [tortious interference] cause of action against the other for conspiring to breach [its own] contract or for wrongfully interfering with its own contract." *Landstrom*, 561 N.W.2d at 17 (quoting *DP Serv., Inc. v. Am Int'l*, 508 F. Supp. 162, 167 (N.D. Ill. 1981)) (alterations added and in original). The South Dakota Supreme Court in *Nelson*, 507 N.W.2d at 700, held that "[i]n South Dakota, no cause of action for tortious interference with contract may be maintained against a corporate officer who, acting within the scope of his or her authority, discharges an employee." The rationale for this rule is that the actions of a corporate officer acting within the scope of his authority are considered the acts of the corporation itself. *Id.* Consequently, there is no identifiable third party when a corporation interferes with its own contracts or business expectancies. *Id.*; *see also Landstrom*, 561 N.W.2d at 16 (explaining that "to hold otherwise would make the director liable for interfering with a business expectancy between a plaintiff and a director with no identifiable third party"). Also relevant is the Corn Palace directorship's status as an at-will position. The Court in *Gruhlke*, 756 N.W.2d at 405, 410, stated that it "regard[s] this type of action with high vigilance" because "the tort should not be tolerated as a device to bypass South Dakota's at-will employment law."

29

In *Gruhlke*, the Court described how to prove that a corporate officer acted outside the scope of his employment by firing an employee. *See id.* at 407. " 'Generally, if an act is connected either directly or indirectly with the business of the employer (designed to benefit the employer's business), that act is conducted within the scope of employment.' " *Id.* (quoting *Deuchar v. Foland Ranch, Inc.*, 410 N.W.2d 177, 180 (S.D. 1987)). The Court then provided a detailed explanation:

> Further, [t]he fact that the servant's act is expressly forbidden by the master, or is done in a manner which he has prohibited, is to be considered in determining what the servant has been hired to do, but it is usually not conclusive, and does not in itself prevent the act from being within the scope of employment. An essential focus of inquiry remains: Were the servant's acts in furtherance of his employment?
>
> Considerations of time, place, and circumstance assist [the] evaluation. The following considerations are relevant: (1) did the officer's acts occur substantially within the time and space limits authorized by the employment; (2) were the actions motivated, at least in part, by a purpose to serve the employer; and (3) were the actions of a kind that the officer was hired to perform. If the officer's actions were at least in part motivated by a purpose to serve the employer, then those actions cannot be the acts of a third party. Indeed, under the Restatement (Second) of Agency § 236 cmt b (1958), "[t]he fact that the predominant motive of the [officer] is to benefit himself . . . does not prevent the act from being within the scope of employment." An officer's actions are outside the scope of employment only if they are "done with no intention to perform [them] as a[n] . . . incident to a service . . ."

*Id.* at 407-08 (internal citations omitted) (alterations in original). "[E]ven if [the officers'] actions are only partially motivated to serve their employer's interests, the officers are not third parties to a contract between the corporate employer and another[.]" *Id.* at 408. Thus, Koch must demonstrate that Tracy "acted

solely in furtherance of [his  own] personal interests so as to preserve the logically necessary rule that a party cannot tortuously interfere with its own contract." *Id.* at 410 (quoting *Latch v. Gratty, Inc.*, 107 S.W.3d 543, 545 (Tex. 2003)).

Here, there is no genuine dispute that Tracy's communications were made "within the time and space limits authorized" by his office as the mayor. *Id.* Likewise, as discussed in section II, *supra*, hiring and removing appointed officials is one of Tracy's prerogatives as mayor. His communications to the press and Mitchell city council concerning the same subject are also within the purviews of his office. His communications were, therefore, "of a kind that [Tracy] was [elected] to perform." *Id.* at 407. Thus, the only question is whether Tracy's actions were motivated solely to further his own personal interests.

Tracy testified that Koch told or otherwise indicated to him that Koch was going to withdraw his name from consideration for the Corn Palace director position. Docket 21-2 at 10. Koch denied telling or indicating to Tracy that he was going to withdraw his name. Docket 21-1 at 36. Thus, whether Koch did or did not inform Tracy that he was going to withdraw his name cannot be resolved by the court. But Koch acknowledges that the reason Tracy wanted to meet with him on October 31 was because Tracy was concerned about information he obtained regarding Koch's misdemeanor conviction. *Id.* at 35. There is no dispute that the previous Corn Palace director was forced to resign after a public scandal involving the Corn Palace's finances. Koch also acknowledged that Tracy said that he "does not micromanage his department

31

heads and that he needs to trust [them]." *Id.* Koch likewise acknowledged that Tracy said he "had problems trusting [Koch] and that [Tracy] lost confidence in [Koch]." *Id.* Koch also recalled that Tracy told him that "we needed this to be a press release where [Koch] withdrew [his] name because that may help keep [Koch's] background out of the public–out of the media." *Id.* Koch agreed that Tracy told him "that [Tracy] thought it would be in [Koch's] best interest for [Koch] to withdraw [his] name[.]" *Id.*

The record supports an inference that Tracy was motivated, perhaps in part, out of a concern for his own interests as mayor. But Koch's admissions preclude a finding that Tracy was motivated *solely* by his own interests. Rather, Koch's admissions show that Tracy was concerned, in part, for Koch's interests. More importantly, however, Koch's admissions show that Tracy was motivated by a desire to appoint a Corn Palace director that he (and the public) could trust, an "act[] . . . at least in part motivated by a purpose to serve [Mitchell]." *Gruhlke*, 756 N.W.2d at 407. The court finds that Tracy's actions were conducted within the scope of his duties as mayor. Consequently, his actions are the actions of Mitchell, and there is no "triangle" for purposes of Koch's tortious interference claim. Thus, defendants are entitled to summary judgment on this issue.

## V.    Intentional Infliction of Emotional Distress

Koch alleges that Tracy is liable for the tort of intentional infliction of emotional distress. This cause of action has four elements: "(1) extreme and outrageous conduct by the defendant; (2) that the defendant intended to cause

32

severe emotional distress; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) severe emotional distress must result." *French v. Dell Rapids Cmty. Hosp., Inc.*, 432 N.W.2d 285, 289 (S.D. 1988); *see also Bass v. Happy Rest, Inc.*, 507 N.W.2d 317, 322 (S.D. 1993) (holding that both intentional and reckless conduct can satisfy the elements of the tort). Tracy argues that Koch cannot prove the essential elements of his claim.

The South Dakota Supreme Court has held that "[p]roof under this tort must exceed a rigorous benchmark." *Henry v. Henry*, 604 N.W.2d 285, 288 (S.D. 2000). "The conduct necessary to form intentional infliction of emotional distress must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community.' " *Id.* (quoting Restatement (Second) of Torts § 46 (1965)). Whether a defendant's conduct is sufficiently "extreme and outrageous" is a question for the court. *French*, 432 N.W.2d at 289.

In *Wangen v. Knudson*, 428 N.W.2d 242, 244 (S.D. 1988), an employer confronted an employee about the employee's drinking habits and told the employee to submit to an in-patient alcohol treatment program or else he would be fired. The Court held that the employer's conduct was sufficiently extreme and outrageous to survive summary judgment. *Id.* at 248. In *Kjerstad v. Ravellette Pubs., Inc.*, 517 N.W.2d 419, 422 (S.D. 1994), an employer was caught spying on an employee while she was using the restroom. The Court

held that the employer's conduct was extreme and outrageous enough to survive summary judgment. *Id.* at 429.

By contrast, in *Nelson*, 507 N.W.2d at 693, an employee sued his former employer for intentional infliction of emotional distress after a public meeting was held in which a motion was made to fire the employee and his job performance was discussed. The motion carried, and the employee was fired. *Id.* The Court held that the employer was entitled to summary judgment because the defendant's conduct was not extreme and outrageous. *Id.* at 699.

The case of *Fix v. First State Bank of Roscoe*, 807 N.W.2d 612 (S.D. 2011), does not involve an employee-employer relationship, but it illuminates the level of conduct required to sustain this cause of action. There, the plaintiff was an elderly woman who owned a home in Faulk County, South Dakota. *Id.* at 614. She deeded the home to her son and daughter-in-law, but retained a life estate. *Id.* The son and daughter-in-law approached the defendant-bank about obtaining a loan. The defendant sought security for the loan in the form of a warranty deed for the property, including the life estate. *Id.* The plaintiff was leery of executing the deed. *Id.* The defendant, however, wrote the plaintiff a letter and assured her that she could retain possession of the home. *Id.* ("In the event that for any reason the bank becomes the owner of the described real estate, you will have full right of possession to the home on the premises as long as you are living"). The defendant, nonetheless, eventually sold the house and attempted to remove the plaintiff. *Id.* The plaintiff sued for intentional infliction of emotional distress. The defendant moved for summary judgment.

34

The South Dakota Supreme Court held that "[t]he facts, as set forth by [the plaintiff], do not meet that 'rigorous benchmark.' " *Id.* at 618 (quoting *Harris v. Jefferson Partners, L.P.*, 653 N.W.2d 496, 500 (S.D. 2002)). The Court explained that

> She bases her claim on the Bank's failure to abide by the letter's promise that she could remain in the house. Instead, the Bank sold the property and told her she had to move out, which she claims caused her severe emotional distress. The Bank may have intentionally reneged on its promise, but such conduct under the circumstances cannot be characterized as 'extreme and outrageous' or exceeding 'all bounds usually tolerated by decent society.'

*Id.* at 618-19 (quoting *Stene v. State Farm Mut. Auto. Ins. Co.*, 583 N.W.2d 399, 404 (S.D. 1998)). Thus, the defendant was entitled to summary judgment.

The majority of Koch's arguments address the purported knowledge, intent, or motivation behind Tracy's comments. But those considerations do not "factor into an examination of the *actual conduct* which must be extreme and outrageous." *Richardson v. E. River Elec. Power Co-op., Inc.*, 531 N.W.2d 23, 29 n.2 (S.D. 1995) (emphasis in original). A defendant's knowledge or intent may be relevant to the issue of whether his conduct is extreme and outrageous when the defendant knows that the plaintiff is extremely sensitive or prone to mental distress. *Harris*, 653 N.W.2d at 502. But Koch has neither demonstrated that he is overly sensitive or susceptible to mental distress, nor has he shown that Tracy was aware of his condition. Thus, the focus remains on Tracy's actual conduct.

Here, the actual conduct at issue is that Tracy did not recommend Koch for the Corn Palace director position and Tracy made comments to the press and Mitchell city council that Koch withdrew his name from consideration for the position. Even if the court assumes that Tracy's statements were false and that he told Koch that he would still recommend Koch for the position after the October 31 meeting, Tracy's conduct would be no worse than lying to and attempting to oust an elderly woman from her home. *Fix*, 807 N.W.2d at 618-19. Even then, Tracy's conduct would not go "beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community." *Henry*, 604 N.W.2d at 288. Thus, Tracy is entitled to summary judgment on this issue.

## CONCLUSION

Tracy and Mitchell are entitled to summary judgment on each cause of action asserted by Koch. Thus, it is

ORDERED that defendants' motion for summary judgment (Docket 19) is granted.

Dated July 12, 2016.

BY THE COURT:

*/s/Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

36